Melissa A. Reinckens (Bar No. 314657)
melissa.reinckens@us.dlapiper.com
Susan N. Acquista (Bar No. 253969)
susan.aquista@us.dlapiper.com
**DLA PIPER LLP (US)**
4365 Executive Drive, Suite 1100
San Diego, California 92121-2133
Tel: (858) 677-1400
Fax: (858) 677-1401

Joshua Schwartzman (*pro hac* forthcoming)
Joshua.schwartzman@us.dlapiper.com
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: (212) 335-4671
Fax: (212) 335-4501

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SAN DIEGO DIVISION

| | |
|---|---|
| TAYLOR MADE GOLF COMPANY, INC., | CASE NO. **'26 CV0250 GPC BJW** |
| Plaintiff, | **COMPLAINT** |
| v. | |
| TOPGOLF CALLAWAY BRANDS CORPORATION, | |
| Defendant. | |

Plaintiff Taylor Made Golf Company, Inc. ("TaylorMade" or "Plaintiff") alleges against Defendant Topgolf Callaway Brands Corp. ("Callaway" or "Defendant") as follows:

## INTRODUCTION

1.      This is an action for false and/or misleading representations or descriptions of facts, false advertising, unfair competition, and deceptive trade practices under the United States Trademark (Lanham) Act, 15 U.S.C. §§ 1051 *et seq.* (as amended), and California statutory and common law arising from Callaway's intentional false and/or misleading representations of fact concerning claims of purported superiority in the performance of its Chrome Tour line of golf balls and disparaging claims about the nature, quality and characteristics of TaylorMade's TP5 and TP5x golf balls.

2.      Specifically, Callaway engaged in and, on information and belief, is still engaging in a coordinated marketing campaign to mislead consumers and retailers to believe that Callaway's golf balls have superior overall quality and performance to other golf balls, including TaylorMade's golf balls, based on nothing more than how the balls appear under an ultraviolet ("UV") light. Callaway, its agents, and representatives have conducted misleading UV light demonstrations in which they disparage TaylorMade's golf balls, including by calling them "mud balls," and by falsely asserting that TaylorMade balls have uneven paint/coating coverage and poor quality control, leading to poor performance. To broaden the reach of this false and/or misleading marketing campaign beyond the immediate audience of Callaway sales representatives, Callaway has instructed its brand ambassadors to perform the UV light demonstration for a wider audience of consumers and has encouraged media outlets to publish information about the UV light demonstration and suggest to consumers that it is an experiment they can perform themselves to obtain reliable and meaningful information about golf ball performance.

3.    A "mud ball" is one of the most derogatory phrases that can be attributed to a golf ball.  Generally, when mud is stuck to the right side of the ball, the ball is more likely to curve left, and vice versa when mud is stuck to the left side of the ball. In short, when mud sticks on a golf ball, it has long been known to affect the flight, trajectory, shape and distance of a golf shot.  Fifteen-time major championship winner, Tiger Woods, was known to yell to his long-time caddie Steve Williams after his rare erratic shots "Goddamn mud ball, Stevie!"[1] The Athletic recently wrote that "mud balls" are the "bane of any pro golfers existence."[2]  TaylorMade takes extreme care to design and manufacture golf balls that contain no imperfections that would disrupt ball flight.

4.    Contrary to the claims made by Callaway, its agents, and/or representatives, TaylorMade's golf balls are engineered for straighter, more consistent flight through precisely designed dimples that reduce drag and enhance lift.  While a UV light may inform whether a golf ball features cosmetics-enhancing UV brightener, Callaway's so-called UV "test" is a flawed and severely misleading basis to compare features that impact golf balls' aerodynamics, trajectory, distance, or other performance attributes.  The demonstration shows that Callaway applies more UV brightener additive to its Chrome Tour golf ball in more layers than TaylorMade's TP5 golf ball, and nothing more.  By using or promoting this irrelevant demonstration to label TaylorMade's golf ball a "mud ball" and suggest inferior performance, Callaway both inflates the capabilities of its own ball by suggesting UV light is a gauge to evaluate golf ball performance and disparages the performance of TaylorMade's golf balls—a modern day parlor trick.

5.    Callaway's actions constitute false and/or misleading representations or descriptions of facts, false advertising, and unfair competition. On information and belief, Callaway's false and/or misleading representations or descriptions of fact,

---

[1] https://www.golfmonthly.com/tour/us-masters/augusta-blog/what-is-a-mud-ball-and-why-do-golfers-hate-them-212264
[2] What is a mud ball? Explaining the PGA Championship's golf rules controversy - The Athletic

false advertising, and unfair competition are likely to and will inevitably demean, disparage and tarnish the goodwill and business reputation created by TaylorMade, harm TaylorMade's credibility in the trade, and reduce the demand for TaylorMade's golf balls and potentially other products.

6.    As a result of Callaway's unlawful actions, TaylorMade seeks a permanent injunction, damages (including the cost of corrective advertising), costs, attorneys' fees, punitive damages, declaratory relief and other relief as more fully set forth below.

## THE PARTIES

7.    Plaintiff TaylorMade is a Delaware corporation with its principal place of business at 5545 Fermi Court, Carlsbad, California 92008.

8.    Defendant Callaway is a corporation organized under the laws of the State of Delaware, having its principal place of business at 2180 Rutherford Road, Carlsbad, California 92008.

## JURISDICTION AND VENUE

9.    This action arises under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  This Court therefore has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises under federal trademark law.  This Court also has supplemental jurisdiction over the subject matter of TaylorMade's California state-law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the federal claim under Article III of the United States Constitution.

10.    This Court has personal jurisdiction over Callaway because, among other things, Callaway transacts business in this District, purposefully avails itself of the rights and benefits of California law, and maintains a substantial, continuous, and systematic contact with the state of California, and in particular this District.  On information and belief, Callaway also (1) markets and sells the golf balls at issue to wholesale retailers and direct to consumers in this District and throughout California

COMPLAINT

through physical and online stores; and (2) enjoys substantial income in California, including through its false and misleading statements.

11.    Venue is proper in this District under 28 U.S.C. § 1391 because Callaway resides or may be found in this District and a substantial part of the events giving rise to these claims occurred in this District.

## BACKGROUND

**A.    TaylorMade's Golf Ball Business**

12.    TaylorMade is the world's leading designer and innovator of golf products and has been at the forefront of innovation and technology in the golf industry for over 45 years. TaylorMade has manufactured, marketed, distributed, and sold golf balls since 1999.

13.    Over the last 25+ years, TaylorMade has invested more than $100 million in manufacturing, R&D and human capital in its golf ball business which underscores the priority that it places on the production of premium, high-performance golf balls.

14.    Today, TaylorMade offers a wide range of golf balls with different performance characteristics and appearances.  TaylorMade's TP5 brand (including TP5x) golf balls are designed for golfers who demand tour-level performance from their golf ball.  The TP5 brand golf balls are TaylorMade's most expensive per dozen and TaylorMade's highest selling golf ball brand.

15.    TaylorMade TP5 brand golf balls are endorsed by some of the best golfers on the PGA and LPGA tours, including Rory McIlroy, Collin Morikawa, Tommy Fleetwood, Nelly Korda, Brooke Henderson, Charley Hull, and more.

16.    TaylorMade has devoted numerous and meaningful resources, encompassing financial investment, dedicated personnel, and considerable time and technical expertise to support and elevate its golf ball business.  Indeed, TaylorMade invested at least $30,000,000 in the past five years promoting and advertising its golf balls in the United States.

17.    For example, TaylorMade maintains a vibrant U.S. social media presence with over 2.6 million followers on Instagram, almost a million followers on YouTube, 800,000 followers on Facebook, and 750,000 followers on X.  TaylorMade also has separate accounts specific to other markets like Europe, Canada, Japan, etc. TaylorMade's social media content centers around engaging content, behind the scenes moments, and product showcases, including for its golf balls.

18.    TaylorMade sells its golf ball products to a variety of customers including to large retail accounts (*e.g.*, DICK'S Sporting Goods and Amazon), specialty golf stores (*e.g.*, PGA Tour Superstore and Worldwide Golf) and club pro shops, and direct to individual golfers through online stores.

19.    TaylorMade's TP5 golf balls are carefully and intentionally engineered. The TP5 golf balls have two layers of coating.  The first coat is white paint that features no UV brightener and the second coat is clearcoat that features a small concentration of UV brightener.  TaylorMade uses thin coats by design to optimize the benefits provided by the ball's dimple pattern, which is designed to reduce drag and increase lift, helping the ball perform better and more consistently in all conditions.

20.    TaylorMade golf balls also undergo vigorous quality control testing. For example, TaylorMade performs regular quality tests that measure the coating on its golf balls under a microscope to ensure that any discrepancy in coating thickness on the ball is within extremely narrow tolerances.  Tests like these ensure that the coating on TaylorMade golf balls will not adversely impact performance and that when golfers use TaylorMade golf balls, they have the consistency and high-performance with which TaylorMade has become synonymous.

**B.    Callaway Directly Competes With TaylorMade For Golf Ball Sales**

21.    Callaway manufactures, markets, and sells golf balls and other golf equipment throughout the United States and worldwide.

22.     Callaway markets its golf balls under various different brands with different design and performance characteristics. Callaway specifically promotes its Chrome Tour golf ball as its tour-level golf ball making it Callaway's equivalent to TaylorMade's TP5 brand.

23.     Callaway, like TaylorMade, applies two layers of coating on its Chrome Tour golf balls.  In contrast to TaylorMade's TP5 coating, however, Callaway's two layers are both clearcoat, each of which includes UV brightener as an additive.  The UV additive sits within the coating atop the cover of the golf ball and makes the ball brighter during play but has no other impact on golf ball performance.

24.     TaylorMade and Callaway are two of the top six largest golf equipment manufacturers in the world.

25.     In the golf ball segment, Callaway and TaylorMade are two of the top three manufacturers in global market share.

26.     Upon information and belief, TaylorMade is the fastest growing golf ball brand of the world's top six golf equipment manufacturers over the past decade. It has been steadily closing the gap between itself and Callaway for golf ball market share over the past decade.

27.     The parties sell their golf balls through overlapping sales channels, including:

    a. On-Course Retail (Pro Shops): Pro shops at golf courses provide a specialized environment where club professionals offer expert advice and custom fitting services.

    b. Off-Course and Sporting Goods Retailers: Off-course golf specialty stores (*e.g.*, Worldwide Golf Shops) and large sporting goods chains (*e.g.*, DICK'S Sporting Goods) offer broad market penetration.

    c. Online Retailers/Marketplaces: E-commerce platforms like Amazon allow the parties to reach a wide consumer audience.

d.  Direct-to-Consumer E-commerce: The parties each operate their own robust brand websites (*i.e.*, Taylormadegolf.com and Callawaygolf.com) where they sell golf balls directly to consumers.

28.    The parties drive sales using overlapping methods. For example, the parties employ sales representatives and other individuals to manage retail accounts. The parties also utilize "on staff" individuals—ranging from high-profile Tour professionals to local club pros—to serve as brand ambassadors and influence consumer purchasing.  For example, local teaching professionals at golf courses are critical "on staff" influencers who drive sales at the point of purchase.  Because these club professionals have deep relationships with their members, their recommendation carries significant weight when a golfer is deciding which ball to buy in the pro shop. The parties may provide "on staff" individuals with free products, discounts, and other sales incentives in exchange for promoting their golf balls. The parties also partner with social media influencers, former pros, and enthusiastic amateurs to promote their respective brands, often offering affiliate commission or other incentives to these types of brand ambassadors who act as agents of the brand.

29.    As detailed below, rather than highlighting the technologies present in its own golf balls, Callaway instead employs improper means in a coordinated effort to disseminate false and/or misleading statements in a misinformation campaign. This misinformation campaign overstates the so-called superiority of Callaway's golf balls and disparages the performance of TaylorMade golf balls in an effort to mislead consumers and prevent further market share gains by TaylorMade in the golf ball segment.

**C.    Callaway's False and/or Misleading Golf Ball Advertising Campaign**

30.    Callaway's false and misleading representations take two forms.  First, Callaway falsely states in express and/or implied terms that its Chrome Tour golf balls perform in a superior way to TaylorMade's TP5 brand golf balls based on how the golf ball looks under UV light in a demonstration.  Second, Callaway disparages

the performance of TaylorMade's top-of-the line TP5 brand golf balls based on the misleading UV light demonstration. But, as Callaway knows or should know, the UV light demonstration is a marketing contrivance that has no bearing on golf ball performance.

31. Callaway has disseminated the false and/or misleading representations through its sales representatives, individuals who are "on-staff" for Callaway, and other Callaway brand ambassadors or influencers who have a material connection with Callaway and are working on behalf of, at its direction, and under its control (collectively, the "Callaway Sales Agents"). Callaway has also induced, encouraged, or promoted the misinformation campaign to third-party golf publications, including, MyGolfSpy, and upon information and belief other media outlets.

       *i.   A Representation of Callaway's Misinformation Campaign.*

32. TaylorMade recently obtained a video demonstration representative of Callaway's misinformation campaign from one of Callaway's sales pitches made by a Director of Golf of a golf club pro shop, who is also a Callaway Sales Agent, and his subordinate at the club.

33. Upon information and belief, Callaway Sales Agents received tutorial(s) or other instruction/information directly from Callaway on how to promote Callaway golf balls using a UV light, as depicted in the video that TaylorMade obtained.

34. Upon information and belief, Callaway Sales Agents have made misleading sales pitches that overemphasize the relevance of UV light on paint coating coverage and golf ball performance, like the pitch in the video TaylorMade obtained, to numerous consumers.

35. The video demonstration TaylorMade obtained compares three golf balls: Callaway's Chrome Tour, Titleist's Pro V1, and TaylorMade's TP5.

36. In the video, the subordinate of the Callaway Sales Agent states that they are "UV light testing golf balls seeing what type of paint coverage these golf balls have for *overall golf performance*." (emphasis added.)

- 8 -

37.    The Callaway Sales Agent then states that the demonstration will show whether "you would want a piece of mud on your ball," and adds that if there is too much paint on a ball, the ball would react as if it were a mud ball.

38.    The Callaway Sales Agent puts the UV light over the Callaway Chrome Tour golf ball and suggests that the ball's bright reaction to UV light and even coverage in the appearance of dimples establishes high performance:



39.    He then puts the UV light over the TaylorMade TP5 golf ball, eliciting awe from the subordinate who observes that the golf ball has a darker spot.  The Callaway Sales Agent suggests that the appearance is indicative of a poor-quality golf ball, saying, "Wow.  Interesting [be]cause from my standpoint it looks like a gigantic piece of mud is right there…right above where it says TaylorMade."  The Callaway Sales Agent concludes the misleading pitch by claiming the appearance of the TaylorMade TP5 golf ball under the UV light means that the coating on the ball could "potentially act like a piece of mud is on the ball and who knows where the ball is going to go…all about quality control."

//////////

40.    There are numerous instances of false and/or misleading information within this type of demonstration by Callaway Sales Agents about the performance of the parties' golf balls, including that:

    a.    A demonstration using UV light can be used to accurately portray the paint or coating coverage of a golf ball (the "UV Demonstration Claims").  Any variation of such demonstration to make claims about golf ball performance is false and/or misleading. Both Callaway and TaylorMade apply two layers of coating onto their golf balls. This demonstration is facially misleading because, among other reasons, the "test" shows *only* that Callaway uses more UV brightener in more layers than TaylorMade.

    b.    The difference in appearance of the golf balls under the UV light are indicative of "overall golf performance" (the "Performance Claims"). This claim cannot be substantiated and upon information and belief, Callaway knows or should know that this claim is false and/or misleading because the patterns of UV brightener dispersion on a golf ball's coating are not indicative of meaningful performance advantages or defects. The presence, thickness, or dispersion of UV brightener in one ball versus another bears no meaningful relationship to ball flight, distance, playability, or other performance attributes.

    c.    The uniform appearance of the dimples and brightness of Callaway's golf ball under UV light is indicative of superior performance (the "Superiority Claims").  In fact, Callaway's Superiority Claims are based on non-performance cosmetic attributes revealed by the misleading UV light demonstration.

    d.    TaylorMade's golf ball is a "mud" ball because the paint or other coating on the ball is unevenly applied to the extent it acts "like a piece of mud" on the ball (the "Mud Ball Claims").  These claims, which the Callaway

Sales Agent makes at least two times in the exemplary demonstration, are highly disparaging and misleading on their face because consumers understand the claims to mean that TaylorMade golf balls have a lower likelihood of flying straight.

e. TaylorMade does not undertake "quality control" tests on its golf balls or that TaylorMade's quality control is inferior to that of Callaway (the "Quality Control Claims").

41.   Together, the UV Demonstration Claims, the Performance Claims, the Superiority Claims, the Mud Ball Claims, and the Quality Control Claims comprise the "False Claims" that make up Callaway's deceptive advertising misinformation campaign (the "Misinformation Campaign").

42.   TaylorMade's investigation into Callaway's False Claims and Misinformation Campaign is ongoing.  The scope, nature, and impact of its false and/or misleading claims and deceptive product demonstrations are still to be determined.

43.   Upon information and belief, the Misinformation Campaign began no later than November 2025.

44.   Upon information and belief, Callaway is currently perpetuating the Misinformation Campaign and intends to continue doing so in the future.

45.   Upon information and belief, the video referred to herein is but one example of Callaway's Misinformation Campaign and there have been many other instances of Callaway's perpetuation of this campaign.

46.   Upon information and belief, Callaway has instructed, encouraged, and/or otherwise enabled Callaway Sales Agents to conduct the Misinformation Campaign and to make any one or more of the False Claims.

47.    Upon information and belief, the Misinformation Campaign is not isolated in nature.  Callaway Sales Agents have disseminated the False Claims to and performed misleading UV light demonstrations for consumers and retail customers

across the United States and Europe.  Upon information and belief, Callaway's Misinformation Campaign has thus far focused on retail customers, including specialty golf stores and pro shops, and media outlets, but TaylorMade believes the False Claims also have been repeated to individual consumers, causing TaylorMade irreparable harm.

48.    On January 6, 2026, MyGolfSpy, a popular digital golf platform that reaches approximately 22 million golfers/consumers, 7 million of which are estimated to be dedicated golfers most likely to be a core audience for premium, high-performance golf balls, published an article about the launch of Callaway's 2026 Chrome Tour and Chrome Tour X golf balls that contains a number of the False Claims.

49.    The article titled "Callaway Doubles Down on Speed and Precision With New Chrome Tour, Chrome Tour X, and Chrome Soft Golf Balls," contains exclusive quotations from Callaway's marketing team indicating that Callaway directly contributed to the claims made in this article.[3]

50.    As part of Callaway's "doubling down" on "precision," the article states that "paint" and "paint coverage" is a "critical part of golf ball performance" and something the public will hear "plenty more about [] this year."  It goes on to state that, while "impossible to see with the naked eye, [paint] can [] disrupt aerodynamics and negatively impact ball flight in all directions."  The article states that Callaway believes it is ahead of the curve and encourages readers to use a UV light themselves on golf balls to evaluate paint coverage, and thereby how golf balls will perform, for themselves. Ultimately, this article parrots Callaway's misinformation playbook and espouses at least the UV Demonstration Claims, Performance Claims, and Superiority Claims.

51.    Consistent with Callaway's past marketing behavior, the MyGolfSpy article confirms TaylorMade's concerns that the Misinformation Campaign is a

---

[3] https://mygolfspy.com/news-opinion/callaway-doubles-down-on-speed-and-precision-with-new-chrome-tour-chrome-tour-x-and-chrome-soft-golf-balls/.

COMPLAINT

coordinated effort by Callaway to unfairly market its Chrome Tour line of golf balls. TaylorMade also suspects that Callaway has or may be planning to expand the scope of its Misinformation Campaign to target more individual golfers and other consumers, directly or indirectly, through other popular third-party golf platforms and media outlets, furthering the reach and harmful impact of the False Claims.

        *ii.   Callaway Misrepresents The Capabilities of Its Golf Balls.*

52.    Callaway has engaged in and may be continuing to engage in a coordinated campaign to mispresent the capabilities of its golf ball through the Misinformation Campaign.

53.    Through the UV Demonstration Claims, the Performance Claims, the Superiority Claims, and the Quality Control Claims, Callaway intends to mislead retailers and consumers into believing that Callaway's golf balls are superior in performance to TaylorMade's golf balls.

54.    As Callaway knows or should know, the UV brighteners it adds to its golf balls are cosmetic additives designed to make balls appear brighter. The presence, thickness, or dispersion of UV brightener bears no meaningful relationship to ball flight, distance, playability, or other performance attributes.

55.    By positioning thicker UV brightener dispersion on Callaway balls as a performance advantage, Callaway creates the false and/or misleading impression that UV brightener patterns correlate with on-course performance and that its golf balls are superior in performance to TaylorMade's golf balls.

56.    Additionally, the UV light demonstration is being conducted without any reliable or standardized controls. The brightness observed during the demonstration can vary based on numerous uncontrolled factors, including, without limitation, the distance of the UV light from the golf ball, the number and duration of prior exposures to the UV light (as repeated exposure to the same spot causes the UV brightener to fade and darken), the amount of sun exposure the ball has received, and differences in how various UV brighteners react to different wavelengths of UV

- 13 -

light.

57.    These uncontrolled conditions render Callaway's UV light demonstration inherently unreliable and misleading as an indicator of the dispersion of UV brightener, and further underscore that the demonstration is a contrived marketing tactic rather than a meaningful test of product performance.

58.    Callaway's statements and demonstration are intended to convey—and, in fact, do convey—the false and/or misleading message to consumers that Callaway offers a higher performing golf ball to obtain an unfair commercial advantage over TaylorMade.

59.    Callaway's Misinformation Campaign is intended to influence purchasing decisions of retailers and consumers, including decisions about stocking and purchasing increased numbers of Callaway golf balls.  Upon information and belief, Callaway's intends for its False Claims to be further disseminated by its retail accounts, media outlets, and brand ambassadors to individual golfers and other consumers.

60.    These statements and demonstrations are literally false and/or, at a minimum, misleading to a substantial segment of the intended audience. They create a false or misleading impression of comparative performance superiority of Callaway's products.

61.    Callaway's false and/or misleading advertising is material because it relates to the inherent qualities or features of golf balls and is likely to influence purchasing decisions by retailers and consumers.

62.    Callaway and/or Callaway Sales Agents disseminated these statements in interstate commerce throughout the United States and, upon information and belief, internationally.

63.    Callaway's conduct has been willful and deliberate, coordinated through its sales force, including the Callaway Sales Agents, using prepared demonstrations and talking points designed to mislead.

*iii.    Callaway Disparages The Capabilities of TaylorMade's Golf Balls.*

64.    Through the UV Demonstration Claims, the Performance Claims, the Mud Ball Claims, and the Quality Control Claims, Callaway has engaged in and, upon information and belief, is continuing to engage in a coordinated campaign to disparage the capabilities and performance of TaylorMade's golf balls through the Misinformation Campaign.

65.    By positioning thinner UV brightener dispersion on TaylorMade golf balls as a performance defect, Callaway creates the false and/or misleading impression that TaylorMade's golf balls are inferior to Callaway's.

66.    Callaway's statements and demonstrations are intended to convey— and, in fact, do convey—the false and/or misleading message to consumers that TaylorMade offers a low performance product with inadequate quality control compared to Callaway's golf ball offerings.

67.    Callaway's Misinformation Campaign is intended to influence purchasing decisions of retailers and consumers, including decisions about stocking and purchasing increased numbers of Callaway golf balls and decreased numbers of TaylorMade golf balls.  Upon information and belief, Callaway intends for the False Claims to be further disseminated by its retail accounts, media outlets, and influencers to individual golfers and other consumers.

68.    These statements and demonstrations are literally false and/or, at a minimum, misleading to a substantial segment of the intended audience. They create a false or misleading impression of comparative performance inferiority of TaylorMade's products.

69.    Callaway's disparaging advertising is material because it relates to the inherent qualities or features of golf balls and is likely to influence purchasing decisions by retailers and consumers.

70.    Callaway's false statements and misleading demonstrations have damaged TaylorMade's reputation and relationships with customers and have

diverted sales to Callaway at TaylorMade's expense.

71.    Callaway and/or Callaway Sales Agents disseminated these statements in interstate commerce throughout the United States and, upon information and belief, internationally.

72.    Callaway's conduct has been willful and deliberate, coordinated through the Callaway Sales Agents using prepared demonstrations, tutorials, and talking points designed to mislead and misrepresent the qualities and characteristics of the parties' respective golf ball offerings.

   *iv.    Callaway's False And Misleading Representations Are Harming and Will Continue to Harm TaylorMade.*

73.    TaylorMade has been or is likely to be injured as a result of Callaway's Misinformation Campaign and False Claims, and it brings this lawsuit to prevent further injury.

74.    Callaway's false and/or misleading representations of fact are likely to, have and will inevitably harm and diminish TaylorMade's goodwill, business reputation and credibility in the trade, and the demand for TaylorMade's products.

75.    Callaway's false and/or misleading representations were made in bad faith and with intent to confuse the relevant consumers and with intent to bolster sales of Callaway's golf balls at the expense of TaylorMade's golf ball sales.  For example, if a Callaway Sales Agent in Golf Club A made one of the False Claims to individual golfers at that club, then Callaway golf ball sales may increase and Golf Club A would then stock less or may not have the need to order more TaylorMade golf balls, and ultimately sell fewer TaylorMade golf balls than it otherwise would. Accordingly, Callaway's conduct likely will cause or already has caused TaylorMade lost profits.

76.    Callaway's false and/or misleading representations are unjustly enriching and unfairly compensating Callaway at the expense of TaylorMade.

77.    Callaway's false and/or misleading representations would encourage

other competitors to make similar claims and/or perform similarly false and/or misleading product demonstrations.

78.    After TaylorMade learned of Callaway's Misinformation Campaign, it contacted Callaway and asked for it to cease making the False Claims including plans for broader dissemination of the False Claims, asked for Callaway to instruct sales representatives to stop making the False Claims, and to refrain from making other false or misleading statements about TaylorMade's products.  Callaway refused to provide written assurance that it would do so.  This suit followed.

## COUNT I
## False Advertising (15 U.S.C. § 1125(a))

79.    TaylorMade realleges and incorporates the previous paragraphs of this Complaint herein.

80.    Callaway, directly and/or through Callaway Sales Agents, has made, and continues to make, in commercial advertising or promotion, false or misleading descriptions of fact and false or misleading representations of fact that misrepresent the nature, characteristics, and qualities of its goods and TaylorMade's goods, in violation of 15 U.S.C. § 1125(a)(1)(B).

81.    The false and misleading advertisements and statements of Callaway and Callaway Sales Agents described herein constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

82.    The false and misleading statements by Callaway and Callaway Sales Agents about the performance superiority of Callaway's golf balls and the comparative performance inferiority of TaylorMade's golf balls through the False Claims have actually deceived or have a tendency to deceive a substantial segment of the intended audience for golf balls.

83.    Upon information and belief, the false and/or misleading statements of Callaway and/or Callaway Sales Agents described herein have influenced the purchasing decisions of golf ball retailers and consumers throughout the United

COMPLAINT

States because the claims relate to an inherent quality of a golf ball—its performance.

84.    The false and/or misleading statements of Callaway and/or Callaway Sales Agents described herein were placed in interstate commerce.

85.    As a direct and proximate result of Callaway's Misinformation Campaign, TaylorMade has been and continues to be injured as a result of Callaway's False Claims, including lost sales, lost market share, harm to goodwill, and irreparable harm to TaylorMade's reputation.  This harm is likely to continue into the future, and its effects will not truly be known for months.

86.    As a direct and proximate result of the acts of Callaway and Callaway Sales Agents, as alleged herein, TaylorMade has suffered and will continue to suffer great damage to its business, goodwill, reputation, and profits, while Callaway profits and/or attempts to profit at TaylorMade's expense.

87.    Callaway's improper and unlawful activities, as described herein, have been willful and deliberate, thereby rendering this an exceptional case under the Lanham Act. Indeed, Callaway knew or reasonably should have known that its Misinformation Campaign and False Claims made thereunder were false and/or misleading. Therefore, Callaway's false and/or misleading advertising of its products was purposeful and knowing and merits a finding that exceptional circumstances exist sufficient to support an award of attorneys' fees, treble damages, and other relief permitted by law.

88.    Callaway's violations have been willful and deliberate, rendering this an exceptional case under the Lanham Act and entitling TaylorMade to an award of attorneys' fees, enhanced damages, and other relief permitted by law.

89.    TaylorMade has suffered an irreparable injury.

90.    TaylorMade has no adequate remedy at law.

91.    The balance of hardships favor granting TaylorMade injunctive relief.

92.    The public interest would be served by enjoining Callaway because it would, among other reasons, stop false and/or misleading advertising from

continuing.

## COUNT II
### (False Advertising – California Business & Professions Code § 17500 *et seq.*)

93.    TaylorMade realleges and incorporates the previous paragraphs of this Complaint herein.

94.    Callaway, in advertising and promoting its golf balls in the State of California and elsewhere, made statements or directed its agents to make statements concerning its products' nature, characteristics, and performance, and comparative statements disparaging TaylorMade's products, that were untrue or misleading as set forth above.

95.    Callaway knew or by the exercise of reasonable care should have known the False Claims were untrue or misleading, in violation of Cal. Bus. & Prof. Code § 17500.

96.    Callaway's false advertising has caused and is causing damage and irreparable harm to TaylorMade in the form of lost profits, loss of market share, loss of sales, and harm to reputation and goodwill, which will continue if not enjoined.

97.    Callaway's conduct constitutes false advertising under Cal. Bus. & Prof. Code § 17500 et seq.  Such false advertising has been done willfully with the intent to harm TaylorMade.

98.    Callaway has benefitted from the sale of its products to consumers who relied upon the untrue and misleading representations set forth herein.

## COUNT III
### (Unfair Competition – California Business & Professions Code § 17200 *et seq.*)

99.    TaylorMade realleges and incorporates the previous paragraphs of this Complaint herein.

100.    Callaway's conduct constitutes unlawful, unfair, and fraudulent business acts and practices under § 17200, including false advertising and misleading statements, and unfair conduct that harms competition and consumers.

101.    By virtue of the acts described herein, Callaway has intentionally misled and deceived consumers and the public and has unfairly competed with TaylorMade.

102.    Callaway by its actions, has irreparably injured TaylorMade. Such irreparable injury will continue unless Callaway is permanently enjoined by this Court from further violation of TaylorMade's rights, for which TaylorMade has no adequate remedy at law.

## COUNT IV
### (Trade Libel)

103.    TaylorMade realleges and incorporates the previous paragraphs of this Complaint herein.

104.    Defendant Callaway, directly or through its agents, has verbally disseminated, and continues to disseminate, false and defamatory statements about TaylorMade's TP5 golf balls to retail accounts that purchase golf balls from both Callaway and TaylorMade as detailed above.

105.    These false and defamatory statements were made by Callaway with the intent to disparage the quality, reliability and performance of TaylorMade's golf balls. These false and defamatory statements play a material and substantial role in inducing retail customers not to purchase TaylorMade golf balls or to induce golfers and other potential customers not to purchase TaylorMade golf balls.

106.    Callaway disseminated its false, defamatory and unprivileged statements with actual knowledge of their falsity or with serious doubts as to their truth, so as to have acted with actual malice.  Callaway intended for dissemination of its statements to result in harm to the interests of TaylorMade, and either recognized or should have recognized that the statements were likely to result in such harm.

107.    The false and defamatory statements alleged herein caused both general and special damages to TaylorMade.

108.    Callaway's actions are wanton, willful, oppressive, malicious and fraudulent. As a consequence, Callaway should be assessed exemplary damages so

as to punish and make an example of Callaway in an effort to deter similar misconduct in the future.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), TaylorMade hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

Wherefore, TaylorMade prays for judgment as follows:

A.     Judgment in favor of TaylorMade and against Callaway on each of TaylorMade's claims.

B.     An order permanently enjoining Callaway, its agents, servants, affiliates, representatives, successors, and assigns, and all those persons or entities in active concert or participation who receive actual notice of the injunctive order pursuant to, without limitation, 15 U.S.C. § 1116(a):

        i.    From disseminating the Misinformation Campaign and False Claims made thereunder including claims that overstate Callaway's alleged superiority or disparage TaylorMade and its golf balls across all media;

        ii.    From making any other false and/or misleading claims about TaylorMade's golf balls;

        iii.    To immediately recall and cease all sales which are or could be derived from such false and/or misleading representations;

        iv.    To publish appropriate corrective advertising;

        v.    From assisting, aiding or abetting any other person or entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (iv) above.

C.     An order, pursuant to 15 U.S.C. § 1116(a), directing Callaway to file with the Court and serve upon TaylorMade, within thirty (30) days after entry of the

injunctive order, a report in writing and under oath setting forth in detail the manner and form by which they have complied with the provisions set forth herein.

D.    An award of TaylorMade's damages in an amount to be determined;

E.    An award of treble damages to TaylorMade in addition to any damages amounts that are determined at trial;

F.    An award of all profits Callaway earned as a result of its false and/or misleading advertising;

G.    An award of TaylorMade's costs of suit and reasonable attorneys' fees;

H.    An order granting an award of punitive and/or exemplary damages for the willful and wanton nature of Callaway's aforesaid acts;

I.    An order granting pre- and post-judgment interest on any recovery by TaylorMade; and

J.    An order of other and further relief as is just and proper.

COMPLAINT

1    Dated:  January 15, 2026                    **DLA PIPER LLP (US)**

2

3                                                */s/ Melissa A. Reinckens*
                                                Melissa A. Reinckens (Bar No. 314657)
4                                                Susan N. Acquista (Bar No. 253969)
                                                **DLA PIPER LLP (US)**
5                                                4365 Executive Drive, Suite 1100
                                                San Diego, California 92121-2133
6                                                Tel: (858) 677-1400
                                                Fax: (858) 677-1401
7                                                melissa.reinckens@us.dlapiper.com
                                                susan.acquista@us.dlapiper.com
8

9

10                                               Joshua Schwartzman (*pro hac forthcoming*)
                                                **DLA PIPER LLP (US)**
11                                               1251 Avenues of the Americas
                                                New York, NY 10020-1104
12                                               Tel: (212) 335-4671
                                                Fax: (212) 335-4501
13                                               Joshua.schwartzman@us.dlapiper.com

14

15                                               *Attorneys for Plaintiff Taylor Made Golf.*
                                                *Co. Inc.*
16

17

18

19

20

21

22

23

24

25

26

27

28

- 23 -