UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLORMADE GOLF COMPANY, INC., Plaintiff, v. TOPGOLF CALLAWAY BRANDS CORPORATION, Defendant. | Case No.: 3:26-cv-250-GPC-BJW **ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** **[Dkt. No. 21.]** |

Before the Court is Defendant's motion to dismiss the first amended complaint. (Dkt. No. 21.) An opposition and reply were filed. (Dkt. Nos. 24, 26.) The Court finds that the matter is appropriate for decision without oral argument pursuant to Local Civ. R. 7.1(d)(1). Based on the reasoning below, the Court DENIES Defendant's motion to dismiss.

**BACKGROUND**

On April 1, 2026, Plaintiff TaylorMade Golf Company, Inc. ("Plaintiff" or "TaylorMade") filed the operative first amended complaint against Defendant TopGolf Callaway Brands Corporation ("Defendant" or "Callaway") for false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), false advertising under California

Business & Professions Code section 17500 *et seq*., and unfair competition under California Business & Professions Code section 17200 *et seq*.[1] (Dkt. No. 16.)

Plaintiff is the world's leading designer and innovator of golf products and has manufactured, marketed, distributed, and sold golf balls since 1999. (Dkt. No 16, FAC ¶ 23.) Over a span of twenty-five years, TaylorMade invested over $100 million in manufacturing, research and developing its golf balls and has devoted numerous resources in financial investments, dedicated personnel, and considerable time and expertise to support and innovate its golf business, including $30 million in the past five years on advertising for its golf balls and a huge presence in social media. (*Id.* ¶¶ 24, 27, 28.) TaylorMade sells its golf balls to a variety of customers: big box retailers, sporting goods stores, specialty golf stores, club pro shops, and individual golfers. (*Id.* ¶ 29.) TaylorMade has a carefully designed and engineered golf ball for tour-level performance known as "TP5 Brand" (includes TP5 and TP5x golf balls). (*Id.* ¶¶ 25, 30.)

Defendant Callaway is a competitor of TaylorMade and also manufactures, markets, and sells golf balls and golf products. (*Id.* ¶ 32.) Callaway has a TP5 brand golf ball equivalent called "Chrome Tour" golf balls. (*Id.* ¶ 33.)

Plaintiff alleges Defendant engaged in a "Misinformation Campaign" to mislead retailers, purchasers, golf professional, and golf consumers into believing Callaway's Chrome Tour golf balls are superior in quality and performance, and that TaylorMade's TP5 golf balls are inferior. (*Id.* ¶¶ 2, 40.) Through express and implied statements, Plaintiff contends Defendant elicited false and misleading statements through "on-staff" sales representatives and other brand ambassadors or influencers who have a connection to Callaway (collectively "Callaway Sales Agents"). (*Id.* ¶ 41.) Plaintiff further alleges

---

[1] The original complaint was filed on January 15, 2026. (Dkt. No. 1, Compl.)

Defendant has also "induced, encouraged, and promoted the misinformation campaign to third-party golf publications to media outlets, including "MyGolfSpy." (*Id.* ¶ 41.)

TaylorMade's TP5 Brand golf balls have two layers of coating: the first inner layer is white paint which is cosmetic and contains no "optical brightener", and the second outermost layer is "clearcoat" that has a low concentration of "optical brightener" and its purpose is cosmetic and stain-resistance. (*Id.* ¶ 30.) According to Plaintiff, the optical brightener is a cosmetic additive that is added to a golf ball to make its appearance brighter and serves a cosmetic and stain-resistant purpose with no impact on ball flight, distance, spin trajectory, or any other performance attribute. (*Id.* ¶¶ 5-6.) Plaintiff also claims the "clearcoat has the highest potential impact on ball performance in flight" and therefore, its intentional thin coating approach (using a low concentration of optical brightener) is a deliberate design decision to improve ball performance. (*Id*. ¶ 30.) As such, the splotchiness on its balls under UV light is Plaintiff's design choice to have a single, thin, clearcoat layer to prioritize performance and not inferior quality or performance. (*Id.* ¶ 31.) Conversely, TaylorMade alleges Callaway similarly applies two layers of coating to their Chrome Tour golf balls, however, both layers contain clearcoat with optical brightener, resulting in a brighter appearance but does not increase quality or performance. (*Id.* ¶ 34.)

TaylorMade clarifies that it does not allege that uneven paint application cannot impact golf ball performance or quality; rather, its claims focus on the unreliability of Callaway's UV light demonstration as a way to evaluate paint coverage, paint uniformity or golf ball quality and performance. (*Id.* ¶ 136.) In fact, the UV light demonstration only reveals the distribution of optical brightener additives, a cosmetic ingredient that has no bearing on ball flight. (*Id.*) TaylorMade explains that Callaway's use of the UV light demonstration, an inherently unreliable demonstration, to make comparative claims about TaylorMade's products is false and misleading. (*Id.*)

**A. UV Light Demonstration**

Plaintiff alleges that Defendant made false and/or misleading representations that Callaway balls are superior to TaylorMade golf balls based on UV light demonstrations showing that brighter even coating of balls such as Calloway perform better than darker, uneven paint/coating coverage such as TaylorMade balls. (*Id.* ¶ 3.)

Around November 2025, TaylorMade alleges the Director of Golf for a golf club pro shop in the Great Lakes region and "on staff" with Callaway ("Callaway Sales Agent"), and responsible for purchasing golf balls for the pro shop and selling them to golfers conducted a ultra-violet ("UV") light demonstration in a sales pitch. (*Id.* ¶¶ 42, 43; *id.*, Ex. A.) In the video, attached as Exhibit A, the Callaway Sales Agent and a subordinate compared three golf balls: TopGolf's Chrome Tour; Titleist's Pro IV; and TaylorMade's TP5. (*Id.* ¶ 44.) The subordinate stated that they were UV light testing what type of paint coverage the golf balls had for "*overall golf performance*." (*Id.* ¶ 45 (emphasis in original).) The Callaway Sales Agent stated the demonstration will show whether there is "too much paint" on the ball, and if so, would result in a "mudball." (*Id.* ¶ 46.) Mudball is a derogatory term used to describe a golf ball that has a bad flight, trajectory, shape and distance due to the presence of mud on the ball and is the "bane of any pro golfer's existence." (*Id.* ¶ 4.) For example, if mud is stuck on the right side of the ball, it will likely curve left and if mud is stuck on the left side of the ball, it will likely curve right. (*Id.*)

The Callaway Sales Agent then proceeds to put the UV light over Callaway's Chrome Tour golf ball, suggesting the ball's bright reaction and even coverage of the dimples established high performance. (*Id.* ¶ 47.) When the UV light hovered over TaylorMade's TP5 golf ball, he suggests the ball's darker spots was an indication of poor quality and performance saying, "Wow. Interesting [be]cause from my standpoint it looks like a gigantic piece of mud is right there . . . right above where it says TaylorMade" and

then proceeds to state that the ball could "potentially act like a piece of mud is on the ball and who knows where the ball is going to go. . . all about quality control." (*Id.* ¶ 48.)

Based on this UV light demonstration, Plaintiff alleges the following express false and/or misleading statement: (a) the use of UV light can measure golf ball quality or performance ("UV Demonstration Claims"); (b) the difference in appearance of golf balls under UV light are indicative of overall golf ball quality and performance ("Performance Claims"), (c) the uniform appearance of Calloway's golf ball dimples and brightness under UV light is indicative of superior quality or performance ("Superiority Claims"); (d) TaylorMade's golf balls are "mudballs" because the paint and coating are not uniformly applied ("Mud Ball Claims"); (e) and TaylorMade's quality control is inferior to Callaway's ("Quality Control Claims"). (*Id.* ¶ 49(a)-(e).)

Plaintiff also claims the UV light demonstration conveyed the following implied false and/or misleading claims: (a) UV light testing is a scientifically valid and reliable method for evaluating golf ball quality and performance; (b) visible differences in UV light appearance correspond to differences in paint coverage, manufacturing quality, and on-course performance; (c) Callaway's golf balls are superior in quality and performance compared to TaylorMade's golf balls based on the UV light testing; (d) TaylorMade's golf balls suffer from manufacturing defects; (e) everyday consumers and golfers can perform such UV light demonstrations and draw conclusions about a golf ball's performance. (*Id.* ¶ 51(a)-(e).) Plaintiff contends these express and implied claims are coordinated effort constituting Callaway's advertising misinformation campaign ("Misinformation Campaign"). (*Id.* ¶ 53.)

Plaintiff explains that the express and implied statements are misleading because UV light demonstrations have no bearing on golf ball quality or performance because the demonstration merely reveals the distribution and uniformity of optical brightener on the surface of the ball. (*Id.* ¶¶ 40, 76.) Thus, a golf ball with a thinner layer of clearcoat

results in a lower concentration of optical brightener, which reveals a dimmer, splotchy, or mottled appearance under a UV light. (*Id.* ¶ 9.) Therefore, a golf ball could look brighter or more uniform under a UV light which is independent of its quality and performance. (*Id.* ¶ 8.)

Plaintiff further points out the UV light test is unreliable, misleading, and lacks standardization because it is highly sensitive to other variables including wavelength and intensity of UV light, distance and angle of which the light is held, the duration of the UV light exposure, prior UV exposure, and ambient lighting conditions, none of which can be standardized. (*Id.* ¶¶ 13, 108.) Other variables also affect how optical brighteners look under UV light including: the age of the ball, the concentration of the optical brightener, the thickness of the coating layer(s), and the characteristics of the substrate beneath the paint which may also contain optical brightener. (*Id.* ¶¶ 7, 8.)

**B. Misinformation Campaign**

Aside from the video demonstration presented in Exhibit A, Plaintiff claims they have received confirmation of reports from its own sales representatives, feedback from retail accounts, its customers and other market intelligence that Callaway has been conducting similar UV light sales. (*Id.* ¶¶ 57, 91.) On information and belief, Plaintiff contends Defendant has performed the misleading UV light demonstrations to numerous retail accounts throughout the United States including national retailers, specialty golfers, Golf club pro shops, and individual consumers. (*Id.* ¶ 57.) Plaintiff further alleges because many of the recipients that heard Defendant's misleading statements are purchasers or influence purchasing decisions by other golfers, Defendant's misleading statements were likely "repeated downstream" to "countless individual golfers." (*Id.* ¶ 58.) Plaintiff also claims because of the nature of the UV light demonstrations, a majority of TopGolf's false and misleading claims are conducted in person and are not recorded. (*Id.* ¶ 57.)

### 1. Preline Meetings

On Plaintiff's information and belief, TopGolf conducted UV light demonstrations at "preline meetings" with at least two of Plaintiff's top five retail customers. (*Id.* ¶ 60.) Preline meetings are strategic marketing meetings between golf equipment manufacturers, such as Plaintiff and Defendant, and wholesale buyers, such as big box retailers, sporting goods stores, specialty golf stores and pro shops, for the purpose of pitching sales of products for the upcoming season, and showing how to market these products to consumers. (*Id.* ¶¶ 61-65.) Because the retailers learn how to advertise and promote a manufacturer's products at these preline meetings, any false or misleading statements are likely to be repeated downstream by retailers to consumers, which multiplies the reach of the manufacturer's message beyond the preline meeting. (*Id.* ¶ 65.) Plaintiff claims that Defendant's decision to disseminate the Misinformation Campaign, promoting Callaway's golf balls and disparaging TaylorMade golf balls, through its preline meetings ensured that the campaign would make its way downstream to retail buyers, in-store staff training and point-of-sale with customers. (*Id.* ¶ 67.)

For instance, on information and belief, around October 2025, Callaway Sales Agents performed the UV light demonstration and communicated its misinformation campaign to the Director of Golf at a private golf course in Jupiter, Florida. (*Id.* ¶¶ 68, 84.) TaylorMade claims that Callaway has performed similar UV light demonstrations and communicated the Misinformation Campaign to numerous purchasers and potential purchasers across the country. (*Id.* ¶ 68.) Plaintiff claims that Callaway's Sales Agent performed the UV light demonstration to representatives of two of the largest national golf retailers in the United States responsible for 10-15% of Plaintiff's overall golf ball sales in October 2025. (*Id.* ¶ 84.) Further, Plaintiff is informed and believe that Callaway performed a UV light demonstration at another private golf club around November 2025. (*Id.*)

Then in mid-January 2026, on Plaintiff's information and belief, Defendant conducted a presentation to a golf specialty retail store in Minnesota that included the UV light demonstration. (*Id.* ¶ 70.) The presentation was attended by fifteen of the retail store's sales associates, with the purpose of training them to convey Defendant's Misinformation Campaign directly to consumers at the point of sale by learning how to promote Defendant's golf balls and disparage Plaintiff's golf balls. (*Id.* ¶¶ 70, 74.) The Misinformation Campaign extended far beyond isolated sales demonstrations and was systematically directed at retail personnel with direct consumer-facing influence and exponentially multiplying the reach and impact of its Misinformation Campaign. (*Id.* ¶ 71.) They also included buyers and managers at specialty golf retail stores including training sales associates, golf professionals and pro shop managers and courses in California, Texas, Florida, Arizona, Minnesota, and other states; and individual consumers who are present during sales presentations at retail locations. (*Id.* ¶¶ 84, 87.) The messaging across different Callaway Sales Agents in different locations reveals a coordinated, company-wide campaign rather than an isolated message. (*Id.* ¶ 87.)

**2. Golf Media**

Upon Plaintiff's information and belief, Defendant's misinformation campaign has also "penetrated" golf media with its "downstream dissemination of misinformation" originating from Callaway Sales Agents. (*Id.* ¶ 92.) On January 6, 2026, MyGolfSpy, a popular digital platform with over 22 million consumers, published "Callaway Doubles Down on Speed and Precision With New Chrome Tour, Chrome Tour X, and Chrome Soft Golf Ball" which contained several statements from Callaway's Misinformation Campaign. (*Id.* ¶¶ 93, 95.) Plaintiff alleges that MyGolfSpy communicated with Callaway's marketing team to discuss its 2026 golf balls for the article. (*Id.* ¶¶ 93, 95.) The article includes false statements consisting of the Misinformation Campaign and also misleads consumer with a "DIY side note" encouraging consumers to conduct its own

UV light demonstration as a way to measure a golf ball's quality and performance based on its "paint coverage." (*Id.* ¶¶ 94, 96.)

**C. Plaintiff's Own Marketing**

In 2026, Plaintiff conducted a marketing campaign for its TP5 Brand golf balls, which describes its new micro-coating technology which applies an ultra-thin, uniform layer of paint and is the next iteration of TaylorMade's focus on making the clearcoat of its TP5 Brand golf balls the optimal thickness. (*Id.* ¶ 129.) Plaintiff rebuts Callaway's claim that this marketing campaign undermines the allegations in this case explaining the new marketing involve improvements in its microcoating technology and not any defect to its prior model-year balls. (*Id.* ¶ 127.) TaylorMade also claims that there is no meaningful difference between how TP5 Brand golf balls with or without microcoating look under UV light because UV light cannot be used as a reliable indicator of whether a golf ball has uneven coating coverage or pooled dimples that impacts quality or performance. (*Id.* ¶ 132.) Plaintiff later removed the advertisement as a "routine business decision made in exercise of caution during active litigation" and contends it is no way a concession on the merits of its case. (*Id.* ¶ 142.)

On April 30, 2026, Defendant filed a motion to dismiss Plaintiff's first amended complaint which is fully briefed. (Dkt. Nos. 21, 24, 26.)

**DISCUSSION**

**A. Legal Standard as to Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Rule 12(b)(6) requires the Court to dismiss claims that fail to establish a cognizable legal theory or do not allege sufficient facts to support a cognizable legal theory. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) (citation omitted). Under Rule

8(a)(2) a complaint must contain "a short and plain statement of the claim which entitles the pleader to relief." Fed. R. Civ. P. 8(a)(2).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

To survive a Rule 12(b)(6) motion to dismiss, a complaint does not need detailed factual allegations, but it must provide allegations that raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. While the plausibility standard is not a probability test, it does require more than a mere possibility the defendant acted unlawfully. *Id.* at 556. "When evaluating a Rule 12(b)(6) motion, the Court must accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party." *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013) (citation omitted).

When dismissal is appropriate, leave to amend should generally be given freely. *Id.* However, if the plaintiff's proposed amendments would fail to cure the pleading's deficiencies and amendment would be futile, the Court may dismiss without leave. *Id.*

**B. Federal Rule of Civil Procedure 9(b)**

In the absence of Ninth Circuit authority, district courts, including this Court, have applied Rule 9(b) to false advertising claims under the Lanham Act that are grounded in fraud. *See In re Outlaw Lab'y, LLP,* 463 F. Supp. 3d 1068, 1082 n.9 (S.D. Cal. 2020) ("the better reasoned authority is that, where a Lanham Act claim is predicated on the theory that the defendant engaged in a knowing and intentional misrepresentation, then Rule 9(b) is applicable.") (quoting 2*3andMe, Inc. v. Ancestry.com DNA, LLC*, 356 F. Supp. 3d 889, 908 (N.D. Cal. 2018), *aff'd,* 778 F. App'x 966 (Fed. Cir. 2019)); *Bobbleheads.com, LLC v. Wright Bros., Inc*., 259 F. Supp. 3d 1087, 1095 (S.D. Cal. 2017) ("As to this threshold matter, the Court agrees with the weight of authority that Rule 9(b) applies to Lanham Act claims that are grounded in fraud."). Moreover, the Ninth Circuit has held that Rule 9(b) applies to state-law causes of action, including the UCL and FAL. *Vess v. Ciba-Geigy Corp., U.S.A*., 317 F.3d 1097, 1103 (9th Cir. 2003) (applying Rule 9(b) to section 17500 claim); *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1125 (9th Cir. 2009) (applying Rule 9(b) particularity requirement to UCL claim grounded in fraud).

In federal court, where a plaintiff alleges fraud or a claim is grounded in fraud, Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* A party must set forth "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Odom v. Microsoft Corp*., 486 F.3d 541, 553 (9th Cir. 2007) (internal quotation marks omitted); *see also Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (noting that particularity requires plaintiff to allege the "who, what, when, where, and how" of the alleged fraudulent conduct).

As such, while "[a]llegations of fraud based on information and belief usually do not satisfy the degree of particularity required" under Rule 9(b), the Ninth Circuit has recognized that the requirements may be relaxed when the facts in support are within the opposing party's knowledge and the plaintiffs cannot be expected to have personal knowledge of the facts constituting the wrongdoing. *Wool v. Tandem Computers Inc*., 818 F.2d 1433, 1439 (9th Cir. 1987), *overruled on other grounds as stated in Flood v. Miller*, 35 Fed. Appx. 701, 703 n.3 (9th Cir. 2002). A plaintiff relying on this exception must still satisfy the particularity requirement by accompanying the allegations of fraud based on information and belief with "a statement of the facts upon which the belief is founded." *Id.; Nayab v. Capital One Bank (USA), N.A.,* 942 F.3d 480, 493-94 (9th Cir. 2019) ("Even under the more rigid pleading standard of Federal Rule of Civil Procedure 9, however, the pleader is not required to allege facts that are "peculiarly within the opposing party's knowledge," and allegations "based on information and belief may suffice," "so long as the allegations are accompanied by a statement of facts upon which the belief is founded.") (citing *Wool,* 818 F.2d at 1439).

**C. Request for Judicial Notice**

Defendant filed a request for judicial notice of 1) the certified transcript of the video lodged as Exhibit A to the FAC; 2) a copy of the January 6, 2026 MyGolfSpy article titled "Callaway Doubles Down on Speed and Precision With New Chrome Tour, Chrome Tour X, and Chrome Soft Golf Balls," referenced in the FAC ); 3) a copy of Plaintiff's February 2, 2026 press release titled "Built Better: TaylorMade Introduces All-New TP5 and TP5x Golf Balls,"; and 4) the existence of the two TaylorMade webpage URLs: https://www.taylormadegolf.com/clubhouse/1264488-video-robot-testing-with-all-new-tp5-and-tp5x-golf-balls.html?lang=en_US and https://www.taylormadegolf.com/clubhouse/1261304-video-tp5-tp5x-microcating.html?lang=en_US and the fact that these two TaylorMade webpages are no

longer available on TaylorMade's website. (Dkt. No. 22.) Plaintiff opposes judicial notice of its February 2, 2026 release arguing that it is not mentioned in the FAC and Defendant seeks to use it for an improper purpose claiming it contradicts the FAC's allegations. (Dkt. No. 25 at 4-5.) It also objects to the judicial notice of the existence of two URLs from its webpage arguing Callaway cannot establish that the two URLs actually contained the marketing videos referenced in the FAC and improperly seeks to have the Court draw adverse inferences to undermine the allegations in the FAC. (Dkt. No. 25 at 6-7.) In reply, Defendant argues that Plaintiff has placed its marketing campaign of the 2026 TP5 golf balls directly at issue in the FAC by referencing its marketing materials and advertisements, which includes the February 2, 2026 press release and as to the two webpage URLs, it seeks judicial notice only as to the existence of the URLs and that they are no longer available. (Dkt. No. 27 at 2.)

Judicial notice and the incorporation-by-reference doctrine are the two exceptions to the general rule that the Court may not consider materials outside the pleadings when ruling on a motion to dismiss for failure to state a claim. *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018). Federal Rule of Evidence 201 provides that a court "may judicially notice a fact that is not subject to reasonable dispute," either because it is (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under the incorporation by reference doctrine, the Court may consider any documents referenced in the complaint or on which the complaint necessarily relies. *Khoja*, 899 F.3d at 1002. A document may be incorporated by reference into a complaint if it "refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* at 1002 (quoting *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003)). "However, if the document merely creates a defense to the well-pled allegations in the complaint, then that

document did not necessarily form the basis of the complaint." *Id.* ("Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims.")

Here, Plaintiff's February 2, 2026 press release titled "Built Better: TaylorMade Introduces All-New TP5 and TP5x Golf Balls," is not mentioned in the FAC and it is not clear whether the marketing campaign TaylorMade references in the FAC includes this press release. Accordingly, the Court DENIES the request for judicial notice of the February 2, 2026 press release as improper material outside the pleading.

Further, it is also not clear whether the two TaylorMade URLs contain the marketing materials Callaway alleges to exist. The FAC acknowledges that TaylorMade removed marketing videos from its website after communications from Callaway. (Dkt. No. 16, FAC ¶ 142.) The existence and removal of marketing videos have already been established in the FAC. Lastly, the two URLs, even if they were the marketing videos, do not form the basis of Plaintiff's claim; rather, they appear to create a defense and not a proper basis for the incorporation by reference doctrine. *See Khoja*, 899 F.3d at 1002. Thus, the Court DENIES the request for judicial notice of the two alleged TaylorMade URLs that were removed from its website.

Accordingly, the Court GRANTS Defendant's request for judicial notice of the certified transcript of the video lodged as Exhibit A to the FAC and a copy of the January 6, 2026 MyGolfSpy article titled "Callaway Doubles Down on Speed and Precision With New Chrome Tour, Chrome Tour X, and Chrome Soft Golf Balls" as unopposed and DENIES Defendant's request for judicial notice the copy of Plaintiff's February 2, 2026 press release titled "Built Better: TaylorMade Introduces All-New TP5 and TP5x Golf Balls,"; and the existence of the two TaylorMade webpage URLs which were later removed.

**D. Lanham Act, 15 U.S.C. § 1125(a)**

Under the Lanham Act, a false advertising claim, "requires a showing that (1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in commercial advertisement or promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008) (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002)). "To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Here, Plaintiff alleges that the alleged express and implied false statements made by Defendant were literally false.

**1. Puffery**

Defendant argues that the four statements in the UV light demonstration video are nonactionable opinion and puffery. (Dkt. No. 21-1 at 14-16.[2]) Plaintiff objects to Callaway's mischaracterization that there are only four false and misleading statements. (Dkt. No. 24 at 13.) Rather, Plaintiff identified five categories of express and five categories of implied misrepresentations and claims they are not puffery. (*Id.*)

An actionable statement under the Lanham Act is "a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of

---

[2] Page numbers are based on the CM/ECF pagination.

objective fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) ("too small" was vague and subjective and not actionable statement). On the other hand, puffery is "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." *Southland Sod Farms*, 108 F.3d at 1145. While general product superiority claims are nonactionable puffery, a "specific and measurable advertisement claim of product superiority based on product testing is not puffery." *Id.* For instance, "Less is More" is nonactionable puffery, but "50% Less Mowing" is actionable because it is a specific and measurable claim of product superiority. *Id.*

"The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1399 (E.D. Cal. 1994). Determining whether an alleged misrepresentation constitutes puffery is a question of law appropriate for resolution on a Rule 12(b)(6) motion to dismiss. *Newcal Indus.*, 513 F.3d at 1053 (9th Cir. 2008) (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 245 (9th Cir. 1990)).

The Court assesses each of the express and implied claims to determine whether they constitute puffery. First, the FAC complains that Callaway's "Mud Ball Claims" falsely allege TaylorMade's TP5 Brand golf balls act "like a piece of mud" due to the uneven paint coating on the ball which negatively impacts the ball's ability to fly straight, and is a specific and measurable claim and not puffery. (Dkt. No. 16, FAC ¶¶ 4, 49.d, 105.)

Callaway's "UV Demonstration Claims" and "Quality Control Claims", (*id.* ¶¶ 49.a, 49.e, 106), which incorrectly assert that a golf ball's appearance under UV light can reveal a defect that is "all about quality control," is a specific, factual statement and based on Callaway's pseudo objective, empirical test suggesting that Plaintiff's manufacturing processes lack adequate quality control or is inferior to Callaway's golf balls. *See Ahern v. Apple, Inc.*, 411 F. Supp. 3d 541, 557 (N.D. Cal. 2019) ("rigorous testing methods that

simulated customers' experiences" was actionable statement because the defendant subjected its products to testing and therefore, "a specific factual assertion which could be established or disproved.").

Similarly, Callaway's "Performance Claims" and "Superiority Claims", which are erroneously based on a golf ball's reaction to UV light and even optical brightener coverage around a ball are indicative of "overall golf performance" and superiority and are measurable statements that can be proven true or false. (*Id.* ¶¶ 49.b, 49.d, 79.)

Next, the implied misrepresentations from the UV light demonstration in Exhibit A placing the parties' golf balls side-by-side under UV light and detecting the difference under UV lighting conveys the claim that Callaway's golf balls have better paint coverage and are comparatively superior to TaylorMade balls. (*Id.* ¶¶ 51, 52, 56.) These allegedly implied false product superiority statements are not vague or highly subjective; rather, they are specific and measurable based on product testing and are not puffery. *See Southland Sod Farms*, 108 F.3d at 1145.

The Court concludes that Plaintiff's alleged false statements are not puffery and constitute actionable false statements.

**2. Actionable False Statements**

Defendant next maintains that Plaintiff has not adequately alleged the "how" or "why" of the false statements required under Rule 9. (Dkt. No. 21-1 at 18.) Plaintiff contends that they have complied with Rule 9 explaining how and why the UV light demonstrations are false and misleading. (Dkt. No. 24 at 16-20.)

Where the results of product testing are alleged to be literally false, "a plaintiff must do more than show that the tests supporting the challenged claim are unpersuasive" and allege "that such tests 'are not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made.'" *Southland Sod Farms*, 108 F.3d at 1139. A plaintiff may allege facts "attacking the validity of the defendant's tests

directly or by showing that the defendant's tests are contradicted or unsupported by other scientific tests." *Id.* (citations omitted). In assessing whether an advertising claim is literally false, it must be "analyzed in its full context." *Id.* As such, "courts have held that a claim can be literally false by 'necessary implication.'" *Id.*

Here, the express and implied misstatements derived from the UV light demonstration, attached as Exhibit A to the FAC, provide the how and why these statements are false and misleading.

First, the FAC alleges that Callaway's express and implied misrepresentations that UV light demonstration can assess a golf ball's quality (UV Demonstration Claim) or performance (Performance Claim) are false and misleading because UV light shows only the amount of optical brightener on a golf ball. (Dkt. No. 16, FAC ¶¶ 49.a, 49.b, 107.a, c.) It also falsely claims that golf balls that are uniformly bright under UV are of superior quality (Superiority Claims) but the uniform brightness only reflects the amount of optical brightener on a golf ball. (*Id.* ¶ 49.c.) Callaway's claim that TaylorMade's golf ball is a "mud ball" because of uneven paint coverage (Mud Ball Claims) is false because UV light testing is not reliable to test for paint coverage and does nothing more than show the comparative brightness of the balls under UV light. (*Id.* ¶¶ 3, 49.d, 107.c.) Similarly, Callaway's claim that due to the UV light demonstration, TaylorMade's quality control on its golf balls is inferior to Callaway's, (Quality Control Claims) is unreliable, false and misleading because TaylorMade conducts rigorous quality control processes. (*Id.* ¶¶ 49.e, 80, 107.b.)

Plaintiff explains that a golf ball appearing under UV light merely shows the distribution of optical brightener, a cosmetic additive, usually added to the clearcoat, the outermost layer of the coating on golf balls, and does not impact ball flight, distance, spin, trajectory or other performance factors. (*Id.* ¶¶ 5-6.) It alleges that the visual differences between its golf ball and Callaway's golf ball from the UV light

demonstration was due to its decision to use a single thin layer of clearcoat with a low concentration of optical brightener over a base of white paint with no optical brightening while Callaway uses two layers of clearcoat containing optical brightener. (*Id.* ¶¶ 10, 34, 107.d.) Because Callaway's Chrome Tour balls contain more optical brightener, they appear brighter under UV light but does not increase quality or performance. (*Id.* ¶ 34.) Moreover, Plaintiff alleges that there is no peer-reviewed study or industry standard supporting UV light demonstrations as a valid test of golf ball quality or performance. (*Id.* ¶ 107.e.)

TaylorMade also asserts that the UV light demonstration is inherently unreliable because testing in an uncontrolled consumer environment without standardized controls as well as uncontrolled variables such as the "wavelength and intensity of the UV light source, the distance and angle at which the light is held, the duration of exposure, prior UV exposure of the golf ball and ambient lighting conditions" impact the results. *(Id.* ¶¶ 13, 108.) According to TaylorMade, the UV light demonstration also applies a two-dimensional light test onto a curved, three-dimensional golf ball which also make the demonstration inherently unreliable. (*Id.* ¶ 13.)

Plaintiff further claims that its golf balls undergo rigorous quality control testing with the use of a high-powered digital microscope with at least 200x magnification to measure paint thickness; in contrast, UV light cannot be used as a reliable indicator of deficient or uneven paint coverage. (*Id.* ¶¶ 107.b, 130.) Plaintiff asserts it conducted internal in-house demonstrations where it applied three coats of optical brightener containing clearcoat on a golf ball which produced a golf ball that was uniformly bright under UV light but flew short and off-line showing that UV light appearance has no

relationship to golf ball quality or performance.[3] (*Id.* ¶ 133.) Plaintiff has alleged facts disputing the validity of the UV light demonstration test.

Accepting these allegations in the FAC as true, Plaintiff has sufficiently alleged that Callaway's UV light demonstration claiming UV light can measure a golf ball's quality or performance, that differences in appearance under UV light is indicative of golf ball performance, that Callaway's golf ball dimples and brighter under UV light are suggestive of superior quality or performance (UV Demonstration, Performance and Superiority Claims), that TaylorMade golf balls have uneven paint and act "like a piece of mud" on the ball and TaylorMade's quality control on its golf balls is inferior to Callaway's (Mud Ball and Quality Control Claims) are not "sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made." *See Southland Sod Farms*, 108 F.3d at 1139. Accordingly, the Court concludes that Plaintiff has sufficiently alleged actionable false statement to support its Lanham false advertising claim.[4]

### 3. Commercial Speech and Interstate Commerce

Defendant next asserts that Plaintiff's Lanham Act claim fails to plead that the false statements were "made in commercial advertisement or promotion" or that Callaway caused them to "enter interstate commerce." (Dkt. No. 21-1 at 22-23.)

---

[3] Defendant challenges the allegations regarding Plaintiff's internal demonstrations as not particularized under Rule 9(b). (Dkt. No. 21-1 at 20.) However, as Plaintiff points out (Dkt. No. 24 at 20), and the Court agrees that Rule 9(b) only applies to Defendant's alleged misrepresentations, not any conduct of Plaintiff.

[4] Defendant argues that to the extent Plaintiff alleges that the UV light claims "are unsubstantiated", the allegations are conclusory and do not state a claim. (Dkt. No. 21-1 at 19-20.) Plaintiff responds its claims are not based on a "lack of substantiation" and that falsity is affirmatively alleged by challenging the validity of the underlying test itself. (Dkt. No. 24 at 20-22.) Further, Plaintiff asserts that the "lack of substantiation" restriction applies to CLRA claims and not Lanham Act claims. *Id*. To the extent Plaintiff is not asserting a lack of substantiation claim, the Court need not address it.

Specifically, Defendant argues that a single UV light demonstration cannot show dissemination to the relevant purchasing public or introduced into interstate commerce by Callaway and allegations on information and belief regarding the larger coordinated campaign do not satisfy Rule 9(b). (*Id.* at 22-25.) Plaintiff contends that the FAC alleges much more than a single UV light demonstration; instead, it alleges that Callaway engaged in a coordinated marketing campaign across the country to reach a large segment of purchaser through preline meetings, in-person UV light demonstrations in retail stores across the country as well as through national golf media. (Dkt. No. 24 at 23-25, 27.)

Under the Lanham Act, a plaintiff must allege that the false advertising claim was "was made in commercial advertisement or promotion" and "the defendant caused its false statement to enter interstate commerce[.] *See Newcal Ind.,* 513 F.3d at 1052. "Commercial advertising or promotion" is defined as: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services . . . [and] (4) must be disseminated sufficiently to the relevant purchasing public . . . ." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir. 1999). Representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," but the representations must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Newcal Indus.,* 513 F.3d at 1054. To be "sufficiently disseminated," the actions must be "part of an organized campaign to penetrate the relevant market," which typically involves "widespread dissemination within the relevant industry." *Ariix, LLC v. NutriSearch Corp*., 985 F.3d 1107, 1114-15 (9th Cir. 2021) (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*., 314 F.3d 48, 57 (2d Cir. 2002)); *Newcal Indus*., 513 F.3d at 1054 (concluding that allegedly false statements were sufficiently disseminated

because they were made in promotional literature distributed to thousands of sales accounts).

As stated above, when the evidence is in the hands of the opposing party, the stringent requirements of Rule 9(b) are relaxed and Plaintiff need only present "a statement of the facts upon which the belief is founded." *See Wool*, 818 F.2d at 1439. Here, Plaintiff alleges that the UV light demonstration, attached as Exhibit A to the FAC, conducted in November 2025 in the Great Lakes region was one example and representative of the numerous UV light demonstrations Callaway has performed to customers throughout the United States. (Dkt. No. 16, FAC ¶ 43.) TaylorMade alleges that it received confirmation from a number of customers that Callaway is conducting similar sales demonstrations and are performed in person and not recorded. (*Id.* ¶ 57.) On information and belief, TaylorMade claims that Callaway has performed similar UV light demonstrations and communicated the Misinformation Campaign to numerous purchasers and potential purchasers across the country. (*Id.* ¶ 68.)

More specifically, on information and belief, Plaintiff alleges that Callaway Sales Agents, in October 2025, performed the UV light demonstration and communicated Misinformation Campaign to the Director of Golf at a private golf course in Jupiter, Florida. (*Id.* ¶ 68, 84.) Further, it maintains Callaway presented the UV light demonstration at preline meetings for at least two of the five biggest retail customers in October and November 2025, and and at another private golf course around November 2025. (*Id.* ¶ 84.) Around mid-January 2026, on Plaintiff's information and belief, Defendant conducted a presentation to a golf specialty retail store in Minnesota that included the UV light demonstration. (*Id.* ¶ 70.) The presentation was attended by fifteen of the retail store's sales associates, with the purpose of training them to convey Defendant's Misinformation Campaign directly to consumers at the point of sale by learning how to promote Defendant's golf balls and disparage Plaintiff's golf balls. (*Id.*

¶¶ 70, 74.) This Misinformation Campaign extended far beyond isolated sales demonstrations and was systematically directed at retail personnel with direct consumer-facing influence and exponentially multiplying the reach and impact of its Misinformation Campaign. (*Id.* ¶ 71.) TaylorMade alleges that it has also received reports from its own sales team that Callaway and its Sales Agents have also communicated the Misinformation Campaign through one-on-one meeting with individual customers and retailers. (*Id.* ¶ 84.) The FAC asserts that Callaway's coordinated advertising campaign was disseminated through its nationwide network of sales representatives, brand ambassadors and 'on-staff' professionals" to mislead national and specialty retailers, golf club pro shops and individual golf professional and consumers. (*Id.* ¶¶ 2, 57, 116, 117.a.) Plaintiff's allegations, on information and belief, that Callaway's commercial advertising or promotion was disseminated to the relevant market through a coordinated Misinformation Campaign, and introduced into interstate commerce, (*id*. ¶¶ 87.c, 93, 117.f), are accompanied with "a statement of the facts upon which the belief is founded." *See Wool*, 818 F.2d at 1439.

In addition, Defendant challenges the alleged nationwide dissemination of the Misinformation Campaign based on an article by MyGolfSpy arguing the statements in the article were not attributed to Callaway. (Dkt. No. 21-1 at 22-23.) According to the FAC, on January 6, 2026, MyGolfSpy, a digital platform that reaches 22 million golfers/consumers of which 7 million are estimated to be the audience of dedicated golfers interested in premium, high-performance golf balls, published an article entitled "Callaway Doubles Down on Speed and Precision With New Chrome Tour, Chrome Tour X, and Chrome Soft Golf Balls." (Dkt. No. 16, FAC ¶¶ 93-95.) According to TaylorMade, the article mimics the false statements that make up the Misinformation Campaign and concluded with a "DIY side note" indicating that golfers can "get a sense of paint uniformity by using a black light." (*Id.* ¶ 94.) Plaintiff alleges that MyGolfSpy

and Callaway's marketing team discussed Callaway's 2026 golf balls before publishing the article. (*Id.* ¶ 93.) Further, the article includes exclusive quotations from Callaway's marketing team suggesting that it directly contributed to the claims made in the article. (*Id.* ¶ 95.)

The Court concludes that Plaintiff has sufficiently alleged that Defendant's alleged coordinated Misinformation Campaign within the golf industry ranging from big box retailers to individual golf consumers constitute commercial advertising or promotion which was introduced into interstate commerce by Callaway. *See Fashion Boutique of Short Hills*, 314 F.3d at 57 ("Thus, the touchstone of whether a defendant's actions may be considered "commercial advertising or promotion" under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement."); *Newcal Indus.*, 513 F.3d at 1054 (dissemination to thousands of defendant's customers and thousands of plaintiff's customers could be sufficiently broad because customer base exceeded tens of thousands).

**E. UCL and FAL**

**1. Standing to Sue**

Defendant challenges Plaintiff's standing to sue under the UCL and FAL under two theories. Callaway argues that TaylorMade has failed to allege lost money or property and has failed to allege reliance or causation. (Dkt. No. 21-1 at 25-28.) Plaintiff responds that it has sufficiently alleged economic standing and reliance. (Dkt. No. 24 at 28-30.)

The UCL and FAL claims are based on Callaway's alleged fraudulent advertising and promotion of its golf balls. (Dkt. No. 16 FAC ¶¶ 169-78.) The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

misleading advertising." Cal. Bus. & Prof. Code § 17200. The FAL prohibits "untrue or misleading" statements. Cal. Bus. & Prof. Code § 17500; *Ebner v. Fresh, Inc*., 838 F.3d 958, 967 n.2 (9th Cir. 2016) ("The FAL prohibits any unfair, deceptive, untrue, or misleading *advertising."*). The language of both statutes is "'broad' and 'sweeping' to 'protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'" *Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 985 (9th Cir. 2015) (quoting *Kwikset Corp. v. Super. Ct*., 51 Cal. 4th 310, 320 (2011)). In order to bring a allege standing under the UCL or FAL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp*., 51 Cal. 4th at 322.

**a. Lost Money or Property**

In 2004, Proposition 64 narrowed standing for individuals alleging UCL and FAL claims to persons who have suffered an injury in fact and have lost money or property as a result of false or misleading advertising. *Hinojos v. Kohl's Corp*., 718 F.3d 1098, 1103 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (quotation omitted); *see also* Cal. Bus. & Prof. Code § 17204, 17535; *Prescott v. Rady Children's Hospital-San Diego*, 265 F. Supp. 3d 1090, 1105 (S.D. Cal. 2017) ("The standing requirements under California's UCL and FAL are . . . identical.") (citing *Kwikset Corp*., 51 Cal. 4th at 320-21).

"Lost money or property" requires a plaintiff to allege "some form of economic injury" as a result of a defendant's conduct. *Hinojos*, 718 F.3d at 1104. As it concerns competitors, courts have found "lost sales, revenue, market share, and asset value" sufficient to allege an economic injury. *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 165 F. Supp. 3d 937, 948 (S.D. Ca. 2016) (quoting *Allergan, Inc., v. Athena*

*Cosmetics*, 640 F.3d 1377, 1382 (Fed. Cir. 2011)); *see also AngioScore, Inc. v. TriReme Medical, LLC*, 70 F. Supp. 3d 951, 962 (N.D. Cal. 2014) (finding an alleged "injury to market share suffered as a result of a competitor's unfair business practice" to be a cognizable injury under the UCL) (citing *Law Offices of Mathew Higbee v. Expungement Assistance Sers.*, 214 Cal. App. 4th 544, 556–61 (2013) (surveying UCL competitor cases where injuries to market share were deemed sufficient)).

Defendant argues that Plaintiff's allegations concerning lost money are based on information and belief and cannot support standing on a UCL and FAL claim. However, conclusory allegations are sufficient on a motion to dismiss if a plaintiff can allege a "chain of inferences showing how defendant's false advertising could harm plaintiff's business." *See Strategic Partners, Inc. v. FIGS, Inc.,* Case No. CV 19-2286-GW(KSx), 2019 WL 12435672, at *4 (C.D. Cal. Aug. 19, 2019) (quoting *TrafficSchool.com, Inc. v. Edriver, Inc.*, 653 F.3d 820, 825 (9th Cir. 2011) (Article III standing)). For example, allegation that "[s]ales gained by one are thus likely to come at the other's expense [and] [e]vidence of direct competition is strong proof that plaintiffs have a stake in the outcome of the suit[.]" *TrafficSchool.com*, 653 F.3d at 825-26.

In this case, the FAC alleges that as competitors, Defendant's Misinformation Campaign, disparaging Plaintiff's golf balls, has diverted sales to Callaway at TaylorMade's expense, (Dkt. No. 16, FAC ¶ 124), on information and belief, retail purchasers have reduced their orders of TaylorMade golf balls and/or increased orders of Callaway balls, (*id.* ¶¶ 145.a, 146.c); and on information and belief, has lost sales revenue, lost profits, and lost market share in the premium golf ball segment due to Callaway's Misinformation Campaign, (*id.* ¶¶ 146.d, 148, 172).

Even though Plaintiff has not alleged a single lost sale, because Defendant is a direct competitor, any alleged false misrepresentations about the quality and performance of TaylorMade's golf ball will increase sales of Callaway's golf balls and cause sales of

TaylorMade golf balls to decrease. *See Strategic Partners, Inc.,* 2019 WL 12435672, at *4 (rejecting defendant's argument that the plaintiff's allegations of reputational harm and lost business are mere conclusions unsupported by facts where the plaintiff alleged the defendant is a competitor and its allegedly wrongful conduct allowed it to gain an upper hand in the market at the expense of the plaintiff).

Nonetheless, Plaintiff has alleged with sufficient facts that it lost money when it incurred financial expenses to combat the Misinformation Campaign by responding to inquiries from customers who have seen or heard about the UV light demonstration. (Dkt. No. 16, FAC ¶¶145.b, c.) That alone is sufficient to allege standing for the UCL and FAL. Thus, the Court concludes that Plaintiff has sufficiently alleged it lost money due to Defendant's alleged Misinformation Campaign and DENIES Defendant's motion to dismiss on this basis.

**b. Actual Reliance**

Next, to allege standing, a plaintiff must allege that the economic injury was the result of the false advertising. *Kwikset Corp*., 51 Cal. 4th at 322. There is a split of authority within California district courts on whether a competitor plaintiff, like a consumer plaintiff, must also allege actual reliance with the majority view holding that a plaintiff must allege its own reliance and not the reliance of third parties. *Jerome's Furniture Warehouse v. Ashley Furniture Indus., Inc*., Case No.: 20CV1765-GPC(BGS), 2021 WL 1541649, at *8 (S.D. Cal. Apr. 20, 2021). This Court has previously adopted the minority view that a "competitor may allege false advertising claims under the UCL and FAL without alleging its own reliance and need only allege it suffered an injury, loss of money or property, as a result of the alleged misrepresentations." *Id.* (citing *Allergan USA Inc. v. Imprimis Pharms, Inc.*, Case No. SA CV 17-1551-DOC (JDEx), 2017 WL 10526121, at *13 (C.D. Cal. Nov. 14, 2017) (declining to extend reasoning in *Kwikset* on UCL false advertising claim requiring plaintiff to plead its own reliance because it

involved consumer claims and not competitor claims); *Lona's Lil Eats, LLC v. DoorDash, Inc.,* No. 20-cv-06703-TSH, 2021 WL 151978, at *10 (N.D. Cal. Jan. 18, 2021) ("A non-consumer plaintiff can allege false advertising claims under the UCL and FAL without alleging its own reliance, as long as the plaintiff has alleged a sufficient causal connection."); and *Simpson Strong-Tie Co. Inc. v. MiTek Inc*., Case No. 20-cv-06957-VKD, 2021 WL 1253803, at *6 (N.D. Cal. Apr. 5, 2021)). Recognizing that the tide has been changing, an increasing number of district courts are ruling that "[t]o have standing for UCL or FAL claims sounding in fraud, a competitor plaintiff need not allege actual reliance so long as there is a sufficient causal connection between the competitor defendant's fraudulent business practices and the competitor plaintiff's injury." *KT Enters LLC v. Comp360, LLC*, 751 F. Supp. 3d 999, 1004 (C.D. Cal. 2023) (citing cases).

Here, the Court similarly adopts its prior ruling that TaylorMade need not allege actual reliance on Callaway's false statements to support its UCL and FAL causes of action; rather, Plaintiff must allege a causal connection between the injury as a result of the alleged misrepresentations. Here, the FAC alleges Callaway's Misinformation Campaign has caused TaylorMade harm as consumers have reached out to TaylorMade inquiring about the UV light demonstration and it has expended financial resources to combat the Misinformation Campaign. (Dkt. No. 16, FAC ¶¶ 145.b, c.) Further, because the Misinformation Campaign has penetrated the retail community, certain retail accounts have reduced their orders of TaylorMade golf balls and/or increased their orders of Callaway golf balls, and has caused TaylorMade's market share in the golf ball market to drop. (*Id.* ¶¶ 145.a; 146.c.) Because these assertions plausibly allege a causal connection between Callaway's alleged misrepresentations and injury, the Court DENIES Defendant's motion to dismiss the UCL and FAL causes of action for failing to allege actual reliance.

/ / /

**2. Actionable Statement**

Relying on its argument above on the Lanham Act, Defendant claims that Plaintiff has failed to allege any actionable false or misleading statement. (Dkt. No. 21-2 at 29.) Plaintiff similarly relies on its prior argument claiming that it has alleged an actionable false or misleading statement. (Dkt. No. 24 at 30.) For the same reasons stated above where the Court concluded that Plaintiff has alleged actionable false or misleading statements, the Court DENIES Defendant's motion to dismiss the UCL and FAL claim for failing to allege an actionable statement.

**3. Unlawful and Unfair Prong**

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted).

Defendant seeks dismissal of the "unlawful" prong of the UCL because it is predicated on the Lanham Act claim. (Dkt. No. 21-1 at 29.) Because the Court DENIES dismissal of the Lanham Act cause of action, the Court DENIES Defendant's motion to dismiss "unlawful" prong of the UCL that is premised on the Lanham Act.

Next, Defendant moves to dismiss the UCL "unfair" prong arguing that Plaintiff has failed to allege conduct amounting to an antitrust violation or harm to the competitive market "as a whole." (Dkt. No. 21-1 at 29-20.) Plaintiff responds that it has alleged a significant threat to competition based on consumers' inability to make informed purchasing decisions based on accurate information about product quality and performance. (Dkt. No. 24 at 31.)

The purpose of the UCL is "to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented." Cal. Bus. & Prof Code §

17001. A business act or practice is "unfair" when the conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 187 (1999). A plaintiff must allege that the defendant's conduct "(1) violates the policy or spirit of the antitrust laws because the effect of the conduct is comparable to or the same as a violation of the antitrust laws, or (2) it otherwise significantly threatens or harms competition." *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 662, (2005) (citing *Cel–Tech*, 20 Cal. 4th at 187). "[W]hen the plaintiff is a direct competitor of the defendant and invokes Section 17200's 'unfair' prong, the word 'unfair'. . . means conduct that . . . otherwise significantly threatens or harms competition." *Worldwide Travel, Inc. v. Travelmate US, Inc*., No. 14–cv–00155–BAS(DHB), 2015 WL 1013704, at *11 (S.D. Cal. 2015) (internal citations omitted). In particular, "[i]njury to a competitor is not equivalent to injury to competition; only the latter is the proper focus of antitrust laws." *Cel-Tech*, 20 Cal. 4th at 186.

The FAC alleges that Callaway's conduct of disseminating false product comparisons threatens to harm competition by undermining consumers' ability to make informed purchasing decisions based on accurate information about product quality and performance and harms consumers who are deprived of truthful information.
(Dkt. No. 16, FAC ¶ 152.) Plaintiff claims this conduct "will encourage a race to the bottom" where competitors will resort to misleading demonstrations and pseudo-scientific claims rather than competing on the actual merits of their products. (*Id.*) Plaintiff also claims that Callaway's Misinformation Campaign "violates the spirit of consumer protection and fair competition laws by weaponizing consumer unfamiliarity with manufacturing processes to create false impressions of product quality." (*Id.* ¶ 153.)

Accepting these allegations as true, Plaintiff has sufficiently alleged that Callaway's Misinformation Campaign harms competition by engaging in dishonest advertising that prevents consumers from making informed purchasing decisions and taking advantage of consumers' lack of knowledge about how golf balls are manufactured by instilling false information about product quality. *See e.g., LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc*., CASE NO. 18-cv-02573-YGR 2019 WL 160335, at *18 (N.D. Cal. Jan. 10, 2019) (denying motion to dismiss UCL unfair prong where plaintiff alleged that the defendant's conduct caused harm to competition by allowing it to ignore law, ethics, and common sense in defiance of healthy competition and as a result, [p]laintiffs, law firms, and legal technology companies across the United States are unable to fairly compete with the defendant). Accordingly, the Court DENIES Defendant's motion to dismiss the "unfair" prong of the UCL.

**4. Restitution and Disgorgement under the UCL and FAL**

Lastly, Defendant claims that the UCL and FAL claims must be dismissed because TaylorMade seek damages or "profits Callaway earned as a result of its false and/or misleading advertising" and damages cannot be recovered under the UCL and FAL. (Dkt. No. 21-1 at 31.) Plaintiff responds that it does not seek monetary relief under UCL and FAL; rather it only seeks injunctive relief. (Dkt. No. 24 at 32.)

"[T]he remedies available in a UCL or FAL action are limited to injunctive relief and restitution." *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 130 (2009). Here, the FAC seeks injunctive relief for the UCL and FAL causes of action. (Dkt. No. 16, FAC ¶¶ 172, 178.) Accordingly, the Court DENIES Defendant's motion to dismiss the UCL and FAL causes of action for failing to properly plead damages.

/ / /

/ / /

/ / /

**Conclusion**

Based on the reasoning above, the Court DENIES Defendant's motion to dismiss the first amended complaint.

IT IS SO ORDERED.

Dated: August 4, 2026

Hon. Gonzalo P. Curiel
United States District Judge